OPINION
This is a consolidated appeal from the judgments of the Seneca County Common Pleas Court, Probate Division, which reformed a land-purchase agreement and invalidated several trust amendments as a result of undue influence placed on, Carl Holmer (Holmer) by his daughter, Defendant-Appellant, Ruth Stockmaster (Stockmaster).
In 1990, Carl Holmer executed a will which left his entire estate to his wife, Anna Holmer, and in the event that Anna predeceased him the will left his entire estate to his two daughters Stockmaster and Plaintiff-Appellee, Marilyn Fox (Fox), in equal shares. At the time Holmer executed his will, he owned three properties; the family farm located in Republic, Ohio (Farm), a residential rental unit located on Schonhardt Street in Tiffin, Ohio, and Holmer's residence located on Circular Street in Tiffin, Ohio. Holmer also appointed his wife as his Power of Attorney for his financial affairs and in the event that she became incapacitated, he appointed Stockmaster and Fox as Co-Powers of Attorney. This Power of Attorney was never revoked.
After Anna Holmer died in 1997, Homer remained in his residence on Circular Street, and Stockmaster became his sole care-provider.[1]
Holmer was in his nineties at that time. While caring for her father, Stockmaster and her husband lived on the family farm without paying any rent. Stockmaster did not hire any professionals to help take care of her father or to clean the home. Stockmaster informed family members that they were not to visit Holmer without calling her first.
On July 8, 1998, Stockmaster had prepared a purchase agreement for the farm. The agreement granted Stockmaster the exclusive right to purchase the farm from Holmer's estate for $90,000. According to a survey performed, the farm was worth approximately $288, 278.50 in 1998.[2]
Additionally, Stockmaster represented to Fox that the farm was worth $150,000. Stockmaster was the only witness when Holmer signed the purchase agreement Later, Connie Lutz witnessed Holmer acknowledge his signature on the agreement. Lutz did not determine whether Holmer understood the effect of the document. Stockmaster was also present when Lutz spoke with Holmer regarding his signature.
The following day, on July 9, 1998, Stockmaster and her husband met with Attorney Thomas Cooper (Cooper) regarding changes to Holmer's estate plan. At the time Cooper discussed the purchase-option with Stockmaster, Cooper asserts that he told Stockmaster that $90,000 for the farm was a low figure considering an auditor valued the farm to be worth at least $195,000. Holmer was not present at the meeting, and Cooper did not speak to Holmer by phone regarding the changes. Fox, who continued to hold a Co-Power of Attorney over Holmer's financial matters, was not invited to and did not attend the meeting. Fox asserts that Stockmaster called Fox from her meeting with Cooper and represented to Fox that the family farm was worth $100,000 or $95,000 and was being placed in a trust with both Fox and Stockmaster's names on the deed.
At the meeting, Stockmaster directed Cooper to prepare (1) The Holmer Family Trust naming Holmer as settlor, trustee and primary beneficiary[3]
and providing for distribution of the trust estate to Fox and Stockmaster in equal shares upon his death (2) a Quit Claim deed transferring Holmer's house on Circular Street and the rental on Schonhardt Street into the trust (3) a Pour-Over Will which revoked his previous wills and provided for the remainder of his estate to be placed in the Holmer Family Trust, and (4) a Power of Attorney naming Stockmaster as an Attorney-in-fact with Fox named as an alternate in the event that Stockmaster was unwilling or unable to serve as Power of Attorney.
On August 6, 1998, in the presence of Stockmaster and two witnesses, Mary Roberts and Ladonna Burns, Holmer signed these documents in his home. Cooper was not present at the signing and did not speak with Holmer to discuss the necessity nor the implications of the documents with Holmer before or contemporaneous to the execution of the trust, pour-over will, quit claim deed and power of attorney.
On September 14, 1998, Holmer signed a warranty deed prepared by Cooper which conveyed the farm to Stockmaster and reserved for Holmer a life estate in the property. Simultaneously, Holmer signed an amendment to the trust which would distribute $45,000.00 to Fox.[4] The execution of these documents was again witnessed by Mary Roberts and Ladonna Burns. Stockmaster was present while Holmer signed the documents.
On July 25, 1999, after Fox learned about the changes in her father's estate plan, she visited Holmer at his home on Circular Street with her daughter, Caroline Duffy (Duffy). At the time of the visit, Holmer was confined to the lower level of the house as he was not able to climb the stairs. Fox and Duffy assert that they waited several minutes before being let into the house and when they were finally let into the house, Stockmaster restricted Fox and Duffy to certain rooms in the house. Fox and Duffy found that the home was filthy and smelled of urine. Fox and Duffy further assert that when Fox tried to enter the kitchen, Fox and Stockmaster got into an argument which resulted in Duffy calling the police.
Officer Kizer of the Tiffin Police Department answered the call. Kizer walked through the house and found that the house had a stale smell and that there were several months of trash in the kitchen. He also found that the bedroom had a strong odor of urine and that the toilet had not been flushed for some time. Kizer did not issue any charges, however, he reported the conditions to the Seneca County Department of Job and Family Services (Family Services).
While Kizer was at the home, Fox and Duffy requested that they be able to speak with Holmer alone. Kizer allowed the meeting and kept Stockmaster outside of the residence. Fox and Duffy audiotaped the following discussion with Holmer regarding his estate:
"Holmer: I didn't give [Stockmaster] the farm
"Holmer: The farm is mine as long as I live
"Fox: and then she gets it
"Holmer: yeah, but she's gonna pay you some money
"Fox: No, I've got the deed right here
 "Holmer: Well, I didn't know . . . she told me she had to pay you some money. I didn't give her the farm.
"* * *
"Duffy: Did she tell you how much money?
"Holmer: $45,000
 "Duffy: So she was going to give mom $45,000 for an $180,000 farm?
"Holmer: It wasn't worth that.
"* * *
 "Holmer: I think its worth $90,000, it ain't worth no $200,000.
 "Duffy: you think it's worth $90,000. Is that why you are coming up with $45,000 from Ruth?
"Holmer: yeah
"* * *
"Holmer: are you taking the houses then?
"* * *
 "Holmer: What about the houses, who gets the houses? Well, I'll give the houses to you then.
 "Duffy: She put them in a trust; you don't own the houses anymore
"Holmer: I don't?
"* * *
"Holmer: Well I can't help that."
On August 2, 1999, Al Dixie, a case worker for Family Services inspected Holmer's residence and found that the house required cleaning. During a follow-up inspection on August 20, 1999, Dixie found Holmer's home to be cleaner and that there was no risk to Carl. Dixie suggested that Holmer use PASSPORT, a home healthcare service as Holmer had the financial ability to pay for the service. During his visits, Dixie found that Holmer appeared weak and refused to speak with Dixie. He directed Dixie to speak with Stockmaster.[5] Upon completion of their investigation, Family Services decided not to remove Holmer from his residence.
Subsequently, Fox contacted Cooper several times in order to express that she did not feel that the changes in the estate plans expressed Holmer's wishes. On August 13, 1999, Cooper wrote Stockmaster to encourage her to bring Holmer to his office to discuss Holmer's estate plans with him personally. Stockmaster did not bring Holmer to Cooper's office. However, on August 31, 1999, Cooper spoke with Holmer on the telephone regarding Holmer's estate. Stockmaster was at Holmer's home during the call. Holmer told Cooper that Fox was only to receive $45,000 and that Stockmaster was to receive the rest of his estate because Ruth had been taking care of him. Holmer also told Cooper that he would rather Fox did not know about the division of his estate. Cooper found Holmer's recent estate plan changes to be inconsistent with his prior estate planning, as Homer had always wanted his estate divided equally between his daughters.
On September 7, 1999, Holmer wrote and signed another amendment to the trust which reiterated the details of his phone call with Cooper. The amendment stated that Fox was to only receive $45,000 for her share of the farm and that Stockmaster was to receive the rest of the estate. Mary Roberts and Ladonna Burns also witnessed Holmer sign these documents and Stockmaster was also present when Holmer signed the trust amendment.
During 1998 and 1999, Stockmaster issued several drafts from Holmer's bank accounts both before and after the creation of the trust. Prior to the creation of the trust, Stockmaster wrote several checks from Holmer's Credit Union account totaling $11,000. Stockmaster also made $12,900[6]
in withdrawals to "cash" from the Holmer Family Trust signing Holmer's name as trustee. Stockmaster purportedly used the funds from the accounts and the trust to make repairs to Holmer's properties and to pay for legal fees. Stockmaster did not provide any documentation to evidence these repairs nor did she produce any document authorizing her to withdraw these funds.
In late October 1999, Holmer fell ill and was taken to a nursing home in Shelby, Ohio. The doctor's reports indicate that Holmer was confused when he was brought to the nursing home. Stockmaster failed to notify Fox of Holmer's illness or impending death. Holmer died on October 28, 1999.
On November 29, 1999, Fox filed a complaint asserting; fraud perpetrated on the decedent, fraudulent transfer of real estate, conversion of decedent's assets, accounting owed to plaintiff, lis-pendens, construction of trust, and tortious interference of Fox's right to inherit. Fox amended the complaint asserting Tortious intentional infliction of severe emotional distress.
Beginning on April 30, 2001, a three-day bench trial was held. On October 3, 2001, the trial court filed a 29-page judgment entry in which the trial court found Stockmaster "guilty" of a violation of concealment of assets under R.C. 2109.50 and directed Stockmaster to pay the principal of $23,230 and a 10% penalty to Fox. The trial court also voided the option-purchase agreement for the farm, voided the trust amendments, and reformed the warranty deed to the farm naming the Holmer Family Trust as the grantee and ordered Stockmaster to pay Fox's attorney's fees. Additionally, the court named Fox as trustee and ordered the properties in the trust to be appraised and auctioned for not less than two-thirds of the appraised value. Specifically, the trial court found
 "In July 1998, and thereafter, Defendant was responsible for the day-to-day care of Carl. This dependent relationship together with her relationship as power of attorney over all of his assets clearly gave defendant a superior bargaining and unfair advantage over Carl.
"* * *
"The court concludes that defendant's actions; her issuance of checks payable to "cash" and to Carl without any showing of how these funds benefited Car[l]; Defendant's preparation of an option to purchase Carl's farm valued at an unconscionable and unfair price that resulted in no benefit to Carl and served to disproportionately penalize Plaintiff; and Defendant's active creation of an estate plan that further perpetuated Defendant's interests in acquiring the Reed Township [f]arm property from Carl at the expense of Plaintiff and without any benefit to Carl, all supports this court's conclusions that Defendant engaged in a course of conduct grounded in bad faith and with purpose to [sic] willfully take undue and unfair advantage of her frail father at the expense of her father and ultimately the Plaintiff."
Additionally, the court found that it "was not convinced that defendant was forthright with the court and was telling the truth. The court did not find the testimony of defendant to be credible and believable."
Finally, the Court directed Fox to receive the first half of the estate and that court costs, real estate taxes, expenses of the sale, fiduciary fees, R.C. 2109.50 principal and fine, and Fox's Attorney's fees should be reduced from Stockmaster's half of the estate.
On October 29, 2001, there was a hearing regarding Attorney's fees wherein the Attorney's stipulated that the itemized list of Attorney's fees were reasonable and necessary. Further, in its October 30, 2001, judgment entry, the trial court expressly found that the fees were reasonable and necessary.
Stockmaster now appeals the October 3, 2001 and October 30, 2001 judgments asserting five assignments of error. The first assignment of error asserts:
 "The judgment that the Appellee proved that Appellant used undue influence upon Carl Holmer by clear and convincing evidence is against the manifest weight of the evidence."
 The exertion of undue influence requires (1) a susceptible party; (2) another's opportunity to exert influence; (3) improper influence exerted or attempted; and (4) the result showing the effect of such improper influence. Kirschbaum v. Dillon (1991), 58 Ohio St.3d 58, 65. Generally, undue influence must be proven by clear and convincing evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Lah v. Rogers (Dec. 31, 1997) Lake App. No. 96 — 071, at *4. However,
 "[w]here a confidential or fiduciary relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee. [citation omitted] In such cases, a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show that his conduct was free of undue influence or fraud and that the donor acted voluntarily and with a full understanding of his act and his consequences. [citation] The donee may rebut the presumption of undue influence by a preponderance of the evidence."
 In re Guardianship of Blumetti (Jan. 14, 1994), Trumbull App. No. 92-T-4752. Undue influence actions regarding joint and survivorship accounts, payable on death accounts and trust agreements have also applied a presumption of undue influence when there is a fiduciary relationship between the creator of the account and the beneficiary. SeeWall v. Mcmillan (March 5, 2002), Shelby App. No. 17-01-11, 2002 Ohio 1022; Gotthardt v. Candle (1999), 131 Ohio App.3d 831, 835 ; Lah, supra. "A fiduciary relationship is one in which special confidence and trust is placed in the integrity and fidelity of another, who acquires a resulting position of superiority or influence by virtue of this special trust."In re estate of Case (April 3, 1998), Montgomery App. No. 16747, citingStone v. Davis (1981), 66 Ohio St.2d 74, 78, 419 N.E.2d 1094.
Considering the presumption of undue influence applicable to this case, this court will not reverse the trial court's ruling as being against the manifest weight of the evidence if there is some competent credible evidence going to all of the essential elements of the case.C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. Specifically, we must examine the trial court's findings and affirm if there is some competent credible evidence that the Stockmaster has shown by a preponderance of the evidence that Holmer's conduct was free from undue influence or fraud and that Holmer acted voluntarily and with a full understanding of his act and his consequences.
In the case sub judice, Stockmaster was in a fiduciary relationship with Holmer as his Power of Attorney. See Rae v. Geier (Sept. 20, 1996), Darke App. No. 1393, (finding a fiduciary relationship between parties when one party gave another a power of attorney); Case, supra. During this relationship, several changes were made to Holmer's estate plan which increased the amount of Holmer's estate Stockmaster would receive. As such, the burden rested with Stockmaster to show that her conduct was free of undue influence and that Holmer voluntarily acted with full knowledge of the consequences of his actions by a preponderance of the evidence.
While there was ample evidence adduced at trial which demonstrates how Holmer was unduly influenced, Stockmaster failed to produce any credible evidence to rebut the undue influence other than the fact that Holmer's signature was on the documents. Furthermore, Stockmaster did not demonstrate that Holmer understood what he was signing or had a proper understanding of the worth of his property. To the contrary, in the audio recording made by Duffy during her and her mother's visit in July of 1999, Holmer seems to be under the impression that he still owns the farm and that when Stockmaster eventually inherited the farm after he died, she was to pay Fox some money. He went on to say that Fox was to receive $45,000 from Stockmaster because the farm was worth $90,000. These statements are consistent with his estate planning prior to Stockmaster's involvement as Holmer's sole power of attorney and daily caregiver which was to divide his assets equally between his daughters.
The majority of the testimony Stockmaster relies on to prove that Holmer was not unduly influenced was her own. However, the trial court specifically found Stockmaster's testimony not to be credible and determining the credibility of the witnesses is within the province of the trial court as that court has the opportunity to view the demeanor of the witnesses. Seasons Coal Co., Inc v. City of Cleveland (1984),10 Ohio St.3d 77, 80. Furthermore, the trial court also discounted the weight of the testimony of the witnesses to Holmer's signing of the documents as Stockmaster was present during the signing of each document.
Based on the foregoing, we cannot find that the trial court's holding that Stockmaster failed to meet her burden of proof was against the manifest weight of the evidence and Stockmaster's first assignment of error is overruled.
Stockmaster's second and third assignments of error will be discussed together.
 "The trial court lacked subject matter jurisdiction to consider O.R.C. § 2109.50 et seq. seq. claims of Appellee.
 "The Trial Court exceeded its authority by ordering the Appellant topay $23,230.00 to the Appellee instead of to the estate of Carl Holmer forthe violation of O.R.C. § 2109.50 et seq. seq."
 R.C. 2109.50 governs when assets are concealed or embezzled from an estate, and provides that "a person interested in such a trust estate * * * [may make a complaint] against any person suspected of having concealed, embezzled or conveyed away or having been in the possession of any moneys * * *. The purpose of 2109.50 et seq. "is not to furnish a substitute for a civil action to recover judgment for money owing to an administrator or executor, but rather to provide a speedy and effective method for discovering assets belonging to the estate and to secure possession of them for the purpose of administration." Goodrich v. Anderson (1940), 136 Ohio St. 509.
In this case, as noted above, Stockmaster wrote several checks from Holmer's bank account and trust. While she contends that she spent the funds on Holmer's care and the maintenance of his properties, there is no evidence to corroborate these allegations or evidence that Holmer knew of these withdrawals.
Stockmaster claims that the trial court does not have jurisdiction under R.C. 2109.50 for actions by an attorney in fact committed during the life of the decedent. However, R.C. 2101.24(B)(1)(b) provides that the probate court has concurrent jurisdiction over "any action that involves an inter vivos trust * * * [or a] power of attorney." Furthermore, R.C. 2101.24 provides that the probate court holds plenary power at law in equity to dispose fully of any matter that is properly before the court unless the power is specifically limited or denied by a provision of the Revised Code.[7] As the assets were withdrawn with a Power of Attorney and partly withdrawn from intervivos trust funds, we find that the probate court had jurisdiction to entertain an action for concealed or embezzled assets under 2109.50. See also In re estate ofPopp (1994), 94 Ohio App.3d 640 (finding probate court had jurisdiction in an action under 2109.50 when money is conveyed to an unauthorized individual without the consent of the deceased or his estate). Wozniakv. Wozniak (1993), 90 Ohio App.3d 400 (finding that plaintiff had stated an actionable cause if the asset was in the exclusive property of the estate and the defend and has unauthorized possession of an asset or has impermissibly disposed of it). The second assignment of error is overruled.
Next, Stockmaster argues that if the court did have jurisdiction over the claim, then the court was required to pay the $23,230 to the estate and not to Fox. Initially, we must remedy a mathematical error in the trial court's R.C. 2109.50 calculations. The judgment entry itemizes the checks that Stockmaster wrote to "cash" and the withdrawals she made from the trust account and then announces that the itemization totals $23,230. However, when independently adding these figures it appears that the total is $23,900 rather than $23,230. Consequently, we will consider this assignment of error using $23,900 as the total of the withdrawals and the checks written to "cash."
R.C. 2109.52 provides,
 "If the person found guilty is the fiduciary, the probate court shall forthwith render judgment in favor of the state against him for such amount or value, together with [a 10%] penalty and costs as provided in this section."
 In this case, Stockmaster withdrew $23,900 from Holmer's accounts and trusts during his lifetime and on first glance it may appear that in order to distribute the estate equally between the sisters that Fox should receive the next $23,230 from the estate which the trial court apparently intended to accomplish by directing reimbursement of the embezzled monies to Fox. However, we find a flaw in this logic. As Stockmaster was one of only two beneficiaries to the trust she in essence misappropriated $11,850 of her own trust money and $11,850 of Fox's trust money. Moreover, Stockmaster was properly required to pay the entire amount of the statutory penalty under R.C. 2109.52 from her half of the estate. As a result, it is our conclusion that the probate court's order for Stockmaster to pay the full amount of $23,900 to Fox and not back to the estate to be divided equally served as a second penalty which was not intended by the statute. To this extent only, Stockmaster's third assignment of error is sustained.
Stockmaster's fourth assignment of error asserts:
 "The trial court erred by ordering that the entire cost of auctioning trust property, real estate taxes on the property, and all other trust expenses should be paid solely from Appellant's share of the trust property."
 Stockmaster further argues that the Court should not have assessed to her alone the costs associated with the trust. However, Appellant has failed to provide any authority binding upon this court which says that a trial court may not assess such costs to a beneficiary who is found guilty of concealing assets and found to have exerted undue influence while in a fiduciary capacity.[8] Accordingly, we find that it was within the probate court's discretion to assess these costs to Stockmaster. See State ex rel. Lewis v. Moser (1995), 72 Ohio St.3d 25, 29 (finding that R.C. 2101.24(C) authorizes any relief required to fully adjudicate the subject matter within the probate court's jurisdiction); Winchel v. Burch (1996) 116 Ohio App.3d 555, 561(finding that in equitable matters, the court has considerable discretion in attempting to fashion a fair and just remedy). The fourth assignment of error is overruled.
Stockmaster's final assignment of error asserts:
 "The trial court erred by failing to include in its judgment entry the basis for the calculation of attorney's fees from the appellant's share of trust property."
 It is well settled that attorney's fees are not recoverable except when there is a specific statutory provision allowing such or where "the losing party has acted in bad faith, vexatiously, wantonly, obdurately or for oppressive reasons." Carnegie Financial Corp. v. Akron National Bank (1976), 49 Ohio App.2d 321, 329. A probate court's finding that a defendant was guilty of concealment of estate assets is "tantamount to a finding that appellant acted in bad faith and/or for oppressive reasons in concealing the assets." In re Estate of Toth (Nov. 29, 1993), Stark App. No. CA-9312. Furthermore, the movant has the burden of proving that the attorney fees sought were actually incurred and are reasonable. In re Estate of Verbeck
(1962), 173 Ohio St. 557, 558-559.
Stockmaster argues that the trial court was required to explain its calculations and make an independent finding as to the reasonableness and necessity of Fox's legal fees. Fox's Attorneys, Thomas Keating and Donald Bennett, submitted an affidavit and "Detail Fee Transaction File List" which explains the service rendered and the amount charged for each service. At the hearing to discuss attorney's fees, the trial court had the following dialogue with Stockmaster's Attorney:
 "The Court: So the Affidavit and the supporting memorandum, you have no problem with those things that Mr. Keating and Mr. Bennett have set out?
"Mr. Tanef: Correct
 "The Court: All right and when you say you don't object, you're saying judge, these are reasonable and necessary?
"Mr. Tanef: I believe so, Your Honor."
 Furthermore, the trial court stated in its judgment entry "The court finds, by stipulation of the parties, and also expressly finds [sic] the fees to be reasonable and necessary. The court had previously announced the basis for [sic] assessing these fees against defendant in its judgment of October 3, 2001, and the court expressly reaffirms those findings within." As the parties stipulated to the calculations and trial court found the attorneys' fees to be reasonable and necessary, Appellants fifth assignment of error is overruled.
Based on the foregoing, the judgments of the trial court are reversed in part, to the extent the court erroneously found the total of misappropriations to equal $23,230 rather than $23,900 and ordered the entire amount to be taken from Stockmaster's half of the estate, instead of only $11,950[9] representing the amount of Fox's rightful share, as discussed under the third assignment of error above. The remainder of the trial court's judgments are affirmed in its entirety and the matter is remanded for further proceedings consistent with this opinion.
Judgments affirmed in part, reversed in part and cause remanded.
WALTERS and HADLEY, JJ., concur.
[1] Stockmaster began providing some care for Holmer since approximately 1990.
[2] The survey was performed in April of 2001.
[3] The trust named Stockmaster the first successor trustee and co-residual beneficiary, and named Fox as second successor trustee and co-residual beneficiary
[4] A note to the trust amendment stated that the distribution of $45,000 to Fox was "an attempt to alternatively accommodate an agreement that was executed on July 8, 1998."
[5] Family Services had received a complaint in 1996 regarding the care of Holmer. At that time, Stockmaster would not allow the caseworker to the home.
[6] Stockmaster wrote a $7000 check on October 25, 1999, four days before Holmer's death.
[7] Stockmaster relies heavily on Schucker v. Metcalf (1986),22 Ohio St.3d 33, and Vogler v. Donley (Dec. 16, 1998), Belmont App. no. 97 BA 63, unreported for the proposition that the probate court does not have jurisdiction of inter vivos trusts and therefore the probate court does not have jurisdiction to hear cases involving gifts given during the lifetime of the decedent. However, the Schucker case was decided before R.C. 2101.24(B)(1)(b) became effective which specifically gives the probate concurrent jurisdiction over "any action that involves an intervivos trust."
[8] In fact, Stockmaster claims that In re Coleman holds that all costs should be taxed on the estate. However, upon a close reading of this case, it appears that the trial court makes this holding because no evidence in that case proved a R.C. 2109.50 violation.
[9] This figure is half of $23,900.